**MARK ALLEN FRANCIS,**                    )
                                                              )
          **Plaintiff,**                                )
                                                              )        **No. 10 C 1404**
                                                              )
          **v.**                                            )
                                                              )        **Magistrate Judge Susan E. Cox**
**MICHAEL J. ASTRUE, Commissioner**     )
**of the Social Security Administration,**     )
                                                              )
          **Defendant.**                            )


## MEMORANDUM OPINION & ORDER

Plaintiff Mark A. Francis ("plaintiff") seeks judicial review of a final decision by the Commissioner of Social Security ("Commissioner") denying his application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Title II of the Social Security Act.[1] The parties submitted cross-motions for summary judgment. Plaintiff seeks a judgment reversing or remanding the Commissioner's decision [dkt. 14] while the Commissioner seeks a judgment affirming his decision [dkt. 16]. For the reasons set forth below, plaintiff's motion is granted and the Commissioner's motion is denied.


### PROCEDURAL HISTORY

Plaintiff filed an application for DIB and SSI on August 7, 2006 alleging disability due to gastroparesis, which is characterized by a delayed emptying of food from the stomach into the small

---

[1] 42 U.S.C. § 405(g).

bowel,[2] and other gastrointestinal problems.[3] A disability determination was issued October 5, 2006 denying plaintiff benefits.[4] On December 11, 2006, plaintiff filed a request for reconsideration,[5] but the original disability determination was affirmed January 29, 2007.[6] On February 14, 2007, plaintiff submitted a request for hearing by an Administrative Law Judge ("ALJ").[7] The hearing took place on April 28, 2008,[8] and the ALJ issued her decision on January 13, 2009.[9] On January 23, 2009, plaintiff requested a review of the ALJ's decision, claiming that it was not issued until after the date last insured, December 31, 2008, thus depriving plaintiff of re-filing and requesting a new hearing.[10] On January 6, 2010, the Appeals Council rejected the claimed basis for a review and denied the request for review of the ALJ's decision.[11] The ALJ's January 13 decision stands as the final decision of the Commissioner. On March 2, 2010, plaintiff filed this action, and both parties subsequently moved for summary judgment.

## STATEMENT OF THE FACTS

This section includes a summary of the facts in the medical record that the ALJ reviewed at plaintiff's hearing. This section also provides a review of the April 28, 2008 hearing before the ALJ and the January 13, 2009 decision issued by the ALJ.

---

[2] TABER'S CYCLOPEDIC MEDICAL DICTIONARY 860 (Donald Venes, M.D., M.S.J. ed., F.A. Davis Company 20th ed. 2005).
[3] R. at 117-118.
[4] R. at 29, 30.
[5] R. at 53, 64.
[6] R. at 31, 32, 58-60 and 64-66.
[7] R. at 69.
[8] R. at 5.
[9] R. at 33.
[10] R. at 94-95.
[11] R. at 1-3.

## A.       Introduction and Medical Evidence

Mark A. Francis was born on March 27, 1959, making him 49 years old at the time of his hearing before the ALJ.[12]   He is 5'10" and 190 pounds, and he had been working as a brick layer since 1989 until November 10, 2005 when he became sick with pneumonia.[13] On August 7, 2006, he filed an application for DIB and SSI where he alleged disability due to gastroparesis and other gastrointestinal problems.[14] He further alleged that nausea, dizziness, shortness of breath, loss of muscle strength and weakness constantly limit his ability to work.[15] November 10, 2005 was his last day of work as well as the alleged onset date.[16] Plaintiff's date last insured was December 31, 2008.[17]

## 1. Evidence of Physical Impairments

## a. The Treating Physician

The medical evidence of plaintiff's physical impairments includes notes by plaintiff's treating physician, Olga M. Peplos, M.D. In a medical source statement that Dr. Peplos prepared and submitted to Disability Determination Services, she listed plaintiff's current diagnoses as persistent nausea, possible irritable bowel, and chronic fatigue as a result of plaintiff's most recent exam on December 12, 2006.[18] Dr. Peplos also reported that an x-ray on January 17, 2007 showed no gastroesophageal reflux, the reflux of acidic gastric contents into the lower esophagus,[19] and that plaintiff's gastric emptying time had returned to normal[20] (having improved from previous testing

---

[12] R. at 113, 127, 136.
[13] R. at 61, 117-20.
[14] R. at 61, 118.
[15] *Id.*
[16] *Id.*
[17] R. at 101.
[18] R. at 549. The report is undated, but it was received by SSA on January 23, 2007 in response to a January 13, 2007 Request for Medical Evidence.
[19] R. at 549, 610; TABER'S CYCLOPEDIC MEDICAL DICTIONARY, *supra* note 2, at 859.
[20] R. at 549, 610.

that showed delayed emptying times[21]). She also reported on a January 16, 2007 endoscopy that resulted in findings of nonerosive gastritis, which is the inflammation of the stomach marked by epigastric pain and nausea.[22] She reported on his current medications: Reglan (for relief of symptoms from gastroesophageal reflux and gastroparesis),[23] which makes him "shaky;" Elavil (amitriptyline, an antidepressant),[24] which makes him tired; Nexium (treatment for gastroesophageal reflux),[25] which does not help; Zofran (for prevention of nausea),[26] which does not help, and Lexapro (for major depressive disorders and generalized anxiety disorder),[27] which also does not help.[28] In response to a question on the form regarding plaintiff's ability to do work-related activities, Dr. Peplos answered, "[plaintiff] states he cannot do [the listed work-related activities] due to nausea [and] must lie down all the time."[29]

**b. Diagnostic Tests and Results**

The evidence also includes numerous diagnostic tests, which all resulted in minimal clinical findings requiring little or no follow up treatment. For example, on December 2, 2005, plaintiff had a colonoscopy, which but for one polyp and internal hemorrhoids, was normal.[30] On December 12, 2005, he had computed tomography ("CT") studies of the abdomen performed that showed a possibility of inflammatory bowel disease but no major abnormalities.[31] On December 20, 2005, plaintiff had a hepatobiliary iminodiacetic acid ("HIDA") scan performed that produced

---

[21] R. at 425, 463.
[22] R. at 549; TABER'S CYCLOPEDIC MEDICAL DICTIONARY, *supra* note 2, at 857.
[23] PHYSICIAN'S DESK REFERENCE 2901 (PDR network, 64th ed. 2010).
[24] TABER'S CYCLOPEDIC MEDICAL DICTIONARY, *supra* note 2, at 89.
[25] PHYSICIAN'S DESK REFERENCE, *supra* note 23, at 711.
[26] PHYSICIAN'S DESK REFERENCE, *supra* note 23, at 1757.
[27] PHYSICIAN'S DESK REFERENCE, *supra* note 23, at 1161.
[28] R. at 550.
[29] *Id.*
[30] R. at 327, 439.
[31] R at 314.

with normal results.[32] On January 3, 2006, plaintiff underwent a bowel study, which raised the possibility of Crohn's disease, but was otherwise unremarkable.[33] On December 29, 2005 and January 16, 2007, plaintiff had gastroscopy studies with normal results.[34] On May 18, 2006, plaintiff, in response to complaints of headaches, blurred vision, and dizziness, had magnetic resonance imaging ("MRI") of his brain performed, the results of which were normal.[35]

**c. Emergency Room Visits**

In addition, plaintiff sought and received limited emergency room treatment on several occasions following complaints of nausea, headaches, shortness of breath, and chest tightness. On July 10, 2006, he was discharged with a diagnosis of labyrinthitis, which is an inflammation in the inner ear whose symptoms include vertigo and vomiting,[36] was and given instructions to continue his regular medications and follow up with Dr. Peplos in three days.[37] On January 20, 2006, he was discharged from the emergency room with a diagnosis of "anxiety palpitations" and given instructions to "return to ER as need" and "take prescriptions as directed."[38] On January 26, 2007, he was again discharged with a diagnosis of labrynthitis and given instructions to return if the condition worsened and to follow up with Dr. Peplos in seven to ten days.[39] On February 22, 2009, plaintiff entered the emergency room complaining of chest tightness and stated that he felt dizzy, tingly, and shaky but that he did not feel nauseous.[40] After determining that he was having a heart attack, the cardiology department was notified, and he was admitted to the

---

[32] R. at 266, 319.
[33] R. at 183, 455.
[34] R. at 329-30, 437-38, and 598-599.
[35] R. at 295, 584.
[36] TABER'S CYCLOPEDIC MEDICAL DICTIONARY, *supra* note 2, at 1193.
[37] R. at 462.
[38] R. at 465.
[39] R. at 597.
[40] R. at 641, 638.

intensive care unit where he was stabilized and treated.[41] The doctor also noted that plaintiff had been "extremely noncompliant" with following the medical therapy prescribed to him.[42]

### d. Treatment from Specialists

After a consultation with gastroenterologist, Richard Rotnicki, D.O., in December 2005, plaintiff underwent an upper endoscopy, small intestinal biopsy, colonoscopy, and ileoscopy, the results of which were "essentially unremarkable."[43] In January 2006, plaintiff had two follow up visits with Dr. Rotnicki, who diagnosed plaintiff as having post-viral gastroparesis with a component of anxiety and depression.[44] Dr. Rotnicki also noted plaintiff's complaints of nausea and stated that the nausea was "most likely functional due to gastroparesis."[45] Dr. Rotnicki noted that plaintiff discontinued use of Reglan and instead decided to try a low-fat and low-residue diet.[46] Dr. Rotnicki reported to Dr. Peplos that "overall [plaintiff] feels better; however, he does have continued symptoms of nausea, which is intermittent and episodic."[47]

In March 2006, plaintiff had two consultations with another gastroenterologist, Riten H. Sheth, M.D.[48] Regarding the nausea, Dr. Sheth stated that "[t]he work up did not reveal any significant pathology so far except for impaired gastric emptying" and that he had "not been able to get other conclusive finding [sic] why he should be having persistent nausea."[49] He advised plaintiff to continue taking Nexium for his gastritis for the next three months even though

---

[41] R. at 638, 643, 647.
[42] R. at 647-48.
[43] R. at 236, 331-35, 425-26, 463-64.
[44] Id.
[45] R. at 236, 425-26, 463-64.
[46] Id.
[47] Id.
[48] R. at 201-213, 405-08.
[49] R. at  406.

6

plaintiff stated that Nexium was not helping.[50] Dr. Sheth also recommended that plaintiff consider an evaluation at a university institute or Mayo Clinic and provided him with contact information, but plaintiff said he did not want to proceed with those recommendations.[51]

Dr. Rotnicki referred plaintiff to Ali Keshavarzian, M.D., another gastroenterologist, for consultation on plaintiff's "irretractable nausea."[52] In a letter to Dr. Rotnicki dated January 30, 2007, in which he recounted plaintiff's history of diagnostic testing and the unremarkable results of each test,[53] he stated, "I am at a loss to explain his unexplained chronic nausea. He may have functional nausea that was triggered by antibiotic."[54] Dr. Keshavarzian recommended that plaintiff see an ear, nose, throat specialist to rule out nausea caused by abnormal middle ear.[55]

Plaintiff consulted with Sherwin Ritz, M.D., an ear, nose, and throat specialist, six times between February 5, 2007 and February 27, 2007 regarding plaintiff's complaints of dizziness.[56] Dr. Ritz reported that on February 1, 2007, plaintiff had a CT scan of the middle ear and mastoids for left ear tinnitus, which produced normal results.[57] His impression was that the dizziness was associated with "change in position"[58] and most consistent with benign paroxysmal positional vertigo, a disorder of the inner ear characterized by vertigo when the head is in a certain position or moving in a certain direction.[59] Dr. Ritz noted some "subjective dizziness" lasting ten to twenty seconds and decided to treat it as an episode of viral labyrinthitis.[60] On February 22, 2007, Dr.

---

[50] *Id.*
[51] *Id.*
[52] R. at 572.
[53] R. at 573-575.
[54] R. at 574.
[55] *Id.*
[56] R. at 577-588.
[57] R. at 584.
[58] *Id.*
[59] *Id.*; TABER'S CYCLOPEDIC MEDICAL DICTIONARY, *supra* note 2, at 2316.
[60] R. at 582-84.

Ritz administered a tilt table test, a test typically used to evaluate the cause of fainting.[61] He recorded that plaintiff's heart rate and blood pressure remained stable and that "[a]t no time did he have any dizziness or any distress."[62]

**e. The State agency consultant's RFC assessment**

On October 4, 2006, State agency consultant, Sandra Bilinsky, M.D., completed a Physical Residual Functioning Capacity ("RFC") Assessment. She determined that plaintiff can lift or carry fifty pounds occasionally and twenty-five pounds frequently; stand and/or walk and sit for about six hours in an eight-hour work day; push and pull without restriction; occasionally climb ramps and stairs but never balance; and has no manipulative, visual, communicative or environmental limitations other than the avoidance of even moderate exposure to hazards such as machinery and heights.[63] She listed "gastroparesis, post viral" as a primary diagnosis and "history of vertigo" as a secondary diagnosis.[64] (True vertigo is a disturbance of equilibrium, but vertigo is sometimes also used as a synonym for dizziness or lightheadedness.[65] It is not known which definition the physician is referring to.) On January 26, 2007, State agency consultant, B. Rock Oh, M.D., reviewed and affirmed Dr. Bilinsky's RFC assessment.[66]

**2. Evidence of Mental Impairments**

Plaintiff's treating psychiatrist for his psychological impairments, Margaret Ward, M.D., completed a Mental Impairment Questionnaire on July 18, 2007.[67] Her observations were based

---

[61] R. at 594; TABER'S CYCLOPEDIC MEDICAL DICTIONARY, *supra* note 2, at 2136.
[62] R. at 594.
[63] R. at 531-38.
[64] R. at 531.
[65] TABER'S CYCLOPEDIC MEDICAL DICTIONARY, *supra* note 2, at 2315.
[66] R at 552-53.
[67] R. at 148-53.

on eight visits with plaintiff between the periods of March 19, 2007 and July 2, 2007.[68] She completed the standard Multiaxial Assessment and, at Axis III, indicated "multiple somatic complaints and symptoms."[69] She stated that plaintiff has "poor compliance," is "somewhat resistant to treatment" and that he has "multiple perceived side effects to meds," which she described as "somatic complaints."[70] Dr. Ward repeatedly characterized plaintiff's complaints and symptoms as "somatic,"[71] but she never explicitly diagnosed plaintiff with somatoform disorder, a mental disorder in which the patient sincerely believes he or she has a serious physical problem and whose physical symptoms suggest, but are not fully explained by, a physical disorder.[72]

On the checklist portion of the questionnaire, "Mental Abilities and Aptitudes Needed to Do Unskilled Work," Dr. Ward indicated that plaintiff is "unable to meet competitive standards" for eleven of the sixteen abilities and is "seriously limited" from the remaining five abilities.[73] With regard to the checklists for "semiskilled and skilled" and "particular types of jobs," she indicated "seriously limited" for six of the nine abilities and "unable to meet competitive standards" for the remaining three.[74] In her explanatory notes, Dr. Ward stated plaintiff has "very limited patience and much irritability with others," that plaintiff "is depressed and anxious" and that his "physical symptoms are perceived as serious illness."[75]

---

[68] R. at 148, 557-564.

[69] R. at 148; *see* DIAGNOSTICS & STATISTICAL MANUAL OF MENTAL DISORDERS (DSM-IV-TR) 27 (American Psychiatric Association 2000) (defining the Multiaxial Assessment as an assessment on five axes, each of which refers to a different domain of information. Axis III represents general medical conditions).

[70] R. at 148.

[71] R at 148-51.

[72] THE MERCK MANUAL OF DIAGNOSIS AND THERAPY 1508-09 (Mark H. Beers, M.D. and Robert Berkow, M.D. eds., Merck Research Laboratories 17th ed. 1999); *see also* TABER'S CYCLOPEDIC MEDICAL DICTIONARY, *supra* note 2, at 2026.

[73] R. at 150.

[74] R. at 151.

[75] *Id.*

With regard to the three listed functional limitations, she selected that his "difficulties in maintaining social functioning" and "difficulties in maintaining concentration, persistence or pace" were both *marked* (as opposed to *none-mild*, *moderate*, or *extreme*).[76] With respect to "restriction of activities of daily living," she selected that this functional limitation was *moderate*.[77]

She indicated that she anticipates that plaintiff's impairments would cause him to be absent from work more than four days per month.[78] In response to whether plaintiff is a malingerer, Dr. Ward responded with a question mark and stated, "likely his anxiety and depression being 'perceived' by [plaintiff] as serious illness."[79] She also answered that plaintiff's impairments are not reasonably consistent with the symptoms and functional limitations described in the evaluation and explained, "[h]e should be more functional; no physical illness identified even with extensive medical testing."[80]

The evidence also includes "progress notes" from James Smedegard, M.D., with whom plaintiff had four visits between July 26, 2007 through January 2, 2008.[81] Dr. Smedegard noted that plaintiff's attention and concentration were "grossly intact" but also indicated, in the Multiaxial Assessment, that he had anxiety disorder and undifferentiated somatoform disorder and depression.[82] At their first visit in July, Dr. Smedegard discussed the uncertain scientific benefit of herbal supplementals when plaintiff expressed his "wishes to continue off psychiatric

---

[76] R. at 152.
[77] *Id.*
[78] *Id.*
[79] R. at 153.
[80] *Id.*
[81] R. at 566-70.
[82] R. at 567.

medications as he does not see himself a psychiatrically ill."[83] Plaintiff typically denied feeling

depressed but did complain of feelings of anxiety as well as "shakiness and dizziness."[84]

## B.    The April 28, 2008 Hearing before the ALJ

Plaintiff appeared for his hearing before the ALJ in Orland Park, Illinois on April 28,

2008.[85] Counsel for plaintiff, Julie Monberg, was present as well as a vocational expert, Michelle

Peters ("VE").[86] Plaintiff's counsel began with an opening statement in which she stated plaintiff's

position that he is disabled because he meets a regulatory disability listing, 12.04 (affective

disorder) and may also meet listing 5.06A (gastroparesis).[87]

Plaintiff's counsel then proceeded to examine plaintiff. Plaintiff explained that the on-set

of his alleged disability occurred in November 2005 when he became sick with pneumonia.[88] He

testified that at the onset he lost forty pounds but that he regained it.[89] Although he recovered

from the pneumonia after about a month of antibiotic treatment, he continued to feel sick.[90] He

described his symptoms to include "extreme nausea, weakness, shaking and...[dizziness] all the

time."[91] Plaintiff said that at that time, he spent his average day lying down or sleeping because

of the sickness.[92] In response to counsel's question on how it is affecting his daily life, he

responded that he "can't do much of anything."[93] In response to questions  regarding his

symptoms of nausea, he said that he has felt it constantly since November 2005 and that it ranges

---

[83] *Id.*
[84] R. at 566-570.
[85] R. at 5, 7.
[86] *Id.*
[87] R. at 8.
[88] R. at 9.
[89] R. at 10.
[90] R. at 9.
[91] *Id.*
[92] *Id.*
[93] *Id.*

from "light to real heavy."[94] With regard to his symptoms of dizziness, he testified that he constantly feels dizzy, shaky, and finds it difficult to balance.[95] He tries to share the housework with his live-in girlfriend, with whom he gets along well,[96] but that he often has to lie down because of the nausea and dizziness.[97] Plaintiff testified that he experiences extremely severe nausea (ten on a ten-point scale) four to seven days a week.[98] Plaintiff described how the extreme nausea effects him: "I can't do much of anything. My body gets very weak. It's like my whole body is sick…my legs shake, my arms shake, everything shakes, and I'm just so weak. I cannot, I go lay down."[99] He also testified that he experiences severe nausea almost every day and that it can take hours or even days to pass.[100] He stated that he does not see family or friends very often but that he tries to take a short walk or a drive every day.[101] Plaintiff acknowledged his diagnosis of anxiety and depression and generally addressed his low level of concentration and recall with regard to reading books and magazines on fishing and sports.[102]

The ALJ then proceeded to examine plaintiff. The ALJ asked about his treatment from Dr. Margaret Ward, and plaintiff explained that she was his regular treating physician for his psychological problems but that he stopped seeing her in June or July 2007 when his insurance termed.[103]  Plaintiff explained that he began seeing Dr. Smedegard in July or August 2007 until a couple months prior for his psychological problems.[104] Plaintiff said that he stopped seeing Dr.

---

[94] R. at 10.
[95] *Id.*
[96] R. at 15.
[97] R. at 11.
[98] R. at 12.
[99] R. at 13.
[100] R. at 11-12.
[101] R. at 10-11.
[102] R. at 14.
[103] R. at 16.
[104] R. at 17.

Smedegard because plaintiff was not seeing any positive results and that the various pills prescribed many times made him feel worse.[105] Plaintiff stated that in an attempt to improve his mood, he takes herbal supplements and tries to educate himself on possible remedies.[106] However, plaintiff said that he has yet to find anything that has helped improve his health conditions.[107] The ALJ then asked whether he takes any medication, and the plaintiff answered that he takes one Xanax at least two to three times per week to help him sleep at night.[108] Plaintiff said that he tries to go fishing once a week and take walks (about one to one and a half miles) and drives in his car in order to help relieve the anxiety, but he also said that these activities do not really have any effect on his mood.[109]

The ALJ asked him about his work as a brick layer, and plaintiff answered that he had been a brick layer his whole life until November 5, 2005.[110] He described the work it entailed: while the laborers carry the bricks and mortar to the brick layers and set up the scaffold, "you [the brick layer] set up your poles on each side, run string across and you lay brick."[111] The ALJ confirmed that the work did not entail any supervisory duties or maintaining equipment.[112]

The ALJ then asked, in regard to plaintiff's nausea and gastrointestinal problems, whether he was following the low-fat, low-residue diet that was recommended to him.[113] The ALJ also noted that the medical records indicate that the recommended diet had helped, at least in January 2006; plaintiff, however, testified that although he continues to maintain a diet of "all vegetables

---

[105] *Id.*
[106] *Id.*
[107] R. at 18.
[108] R. at 20.
[109] *Id.*
[110] R. at 21-22.
[111] R. at 22.
[112] *Id.*
[113] *Id.*

and rice," it has never helped his nausea and gastrointestinal problems.[114] Finally, the ALJ asked about whether plaintiff has been diagnosed with Crohn's disease and how often he experiences dizziness.[115] Plaintiff answered that he was told that he possibly has Crohn's Disease and that he constantly experiences at least "light" dizziness.[116] He testified, "[i]f I don't watch how I walk or how I'm doing things, I'll go lose my balance....It's not overly severe, but it is definitely there."[117]

Upon re-examination by plaintiff's attorney, plaintiff testified that on an average day, he has to take four to five breaks that can last one hour or more each owing to his nausea.[118] He continued, "[i]t turns on and off whenever it wants and it's all through the day, pretty much every day. Some days I get a little break, and I feel better than others."[119]

Next, the ALJ examined the VE, a certified and licensed rehabilitation counselor who testified that she had previously reviewed the file.[120] She identified the exertional level and skill level of the work of a brick layer as heavy in physical demand and skilled in nature, and she added that those classifications are consistent with a review of the record and the Dictionary of Occupational Titles ("DOT").[121] The ALJ then posed a hypothetical to determine whether the following individual would be capable of plaintiff's past work: an individual of the plaintiff's age, education and work experience limited to medium work.[122] The ALJ specified that medium work

---

[114] R. at 22-23.
[115] R. at 23.
[116] Id.
[117] Id.
[118] R. at 24.
[119] Id.
[120] Id.
[121] R. at 25.
[122] Id.

excludes the climbing of ladders, ropes or scaffolds and likewise excludes balancing.[123] It does include occasional climbing of ramps and stairs with occasional stooping, kneeling, crouching and crawling.[124] The ALJ further specified that the hypothetical individual should avoid unprotected heights, dangerous machinery, moving machinery and would be limited to unskilled, simple, routine, repetitive work.[125] The VE concluded that such individual would not be capable of plaintiff's past work.[126] She added that such individual would be capable of assembly-type positions, of which there are approximately 2,500 positions in the Chicago and metropolitan area.[127] In addition, the hypothetical individual would be capable of hand packaging-type and inspection-type positions, of which there are approximately 2,000 of each.[128] The ALJ then altered the hypothetical individual to be limited to light work and with the same additional limitations.[129] The VE answered that the individual would be capable of certain assembly (1,800 positions), packaging (1,500 position), and sorting (1,200 positions).[130] The individual limited to sedentary work would be capable of certain assembly (1,000 positions), packaging (1,200 positions), and sorting (950 positions).[131] The VE confirmed that the positions she identified are consistent with those found in the DOT.[132]

Plaintiff's attorney then proceeded to examine the VE first by posing the same hypothetical, an individual limited to medium work (along with the additional limitations

---

[123] *Id.*
[124] *Id.*
[125] *Id.*
[126] *Id.*
[127] *Id.*
[128] *Id.*
[129] R. at 26.
[130] *Id.*
[131] *Id.*
[132] *Id.*

specified by the ALJ) but further limited it by the need to take four to five unscheduled breaks per day of up to one hour.[133] The VE said that there would be no work for a person of those limitations and supported her conclusion by stating that an individual working in competitive employment has to work on what is considered to be a constant basis, defined by the Department of Labor as eighty-two percent of the work day.[134] Plaintiff's attorney concluded the examination by asking about how an individual's competitive employment would be affected if he was absent more than four days per month (referring to the Mental Impairment Questionnaire completed by Dr. Ward).[135] The VE testified that the individual would fail to meet a requirement for maintaining competitive employment, also referred to as work on a constant basis.[136]

## C. The January 13, 2009 Decision by the ALJ

The ALJ issued an unfavorable decision for plaintiff, concluding that he was not under a disability within the meaning of the Social Security Act from November 10, 2005.[137] When determining whether a claimant is disabled, the ALJ is required to apply the regulatory five-step sequential evaluation process.[138] At step one, if it is determined that the claimant is performing substantial gainful activity, then he is not disabled; otherwise, the ALJ proceeds to step two.[139] At step two, if it is determined that the claimant does not have a severe impairment, then he is not disabled; otherwise, the ALJ proceeds to step three.[140] At step three, if it is determined that the

---

[133] R. at 27.
[134] *Id.*
[135] *Id.*
[136] *Id.*
[137] R. at 36.
[138] 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).
[139] 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).
[140] 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).

claimant meets or medically equals one of the listed impairments in 20 C.F.R., Part 404, Subpart P, Appendix 1, he is disabled; if he does not meet a Listing, the ALJ continues the evaluation.[141] But before proceeding with the sequential process, the ALJ must first determine the claimant's RFC, an assessment that identifies the most a claimant is capable of doing despite his limitations.[142] At step four, if the ALJ determines the claimant is capable of performing his past relevant work in spite of his RFC, he is not disabled; otherwise, the ALJ proceeds to step five.[143] At step five, if the ALJ determines the claimant is capable of performing other work, jobs that exist in a significant number in the national economy, in spite of his RFC, he is not disabled; however if he is not capable, then he is disabled within the meaning of the Social Security Act.[144]

At step one, the ALJ concluded that plaintiff had not engaged in substantial gainful activity since November 10, 2005, the alleged onset date.[145] At the second step, the ALJ found that plaintiff did suffer severe medically determinable impairments: vertigo, gastroparesis, irritable bowel syndrome, depression and somatoform disorder.[146] The ALJ explained that diagnostic tests and evaluations in the medical record confirmed these impairments and that because they limited plaintiff's ability to perform the full range of basic work activities, the impairments were severe.[147] This brought the ALJ to the third step of the sequence where it was determined that plaintiff did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R., Part 404, Subpart P, Appendix

---

[141] 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).
[142] 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).
[143] 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).
[144] 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v), and 404.1560(c).
[145] R. at 38; *see also* 20 C.F.R. §§ 404.1520(b), 416.920(b).
[146] R. at 38.
[147] *Id.*; *see also* 20 C.F.R. §§ 404.1520(c), 416.920(c).

1. The ALJ explained that he considered plaintiff's medical records and the State agency medical opinion and thus compared the objective medical evidence to the requirements of the listed digestive system impairments.[148] With regard to plaintiff's mental impairments, the ALJ applied the "paragraph B" criteria to Listing 12.04 (affective disorders) and Listing 12.07 (somatoform disorders) and found that the criteria were not satisfied.[149] The ALJ explained that according to the regulations, in order to meet one of the Listings, plaintiff's mental impairments would have to result in either at least two of the following three criteria: *marked* restriction of activities of daily living; *marked* difficulties in maintaining social functioning; *marked* difficulties in maintaining concentration, persistence, or pace; or one of these three criteria along with repeated episodes of decompensation (meaning at least three in one year or an average of once every four months each lasting for at least two weeks).[150] The ALJ explained that a "marked" restriction means more than moderate but less than extreme and concluded that plaintiff had only *mild* restriction of activities of daily living, *mild* difficulties in maintaining social functioning, *moderate* difficulties in maintaining concentration, persistence or pace, and no episodes of decompensation.[151] The ALJ stated that nothing in the record supports any "paragraph C" criteria, which, if satisfied, would have allowed a finding of the mental impairment (as an alternative to satisfying "paragraph B" criteria).[152]

Before proceeding to steps four and five, the ALJ, as required by the sequential evaluation process, made an RFC determination and explained how she arrived this specific RFC for

---

[148] R. at 38-39; *see also* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 5.00.
[149] R. at 39; 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00.
[150] *Id.*
[151] *Id.*
[152] R. at 39.

plaintiff.[153] The ALJ found that plaintiff has the RFC to perform medium work, as defined in 20 C.F.R. sections 404.1567(c) and 416.967(c), which, the ALJ noted, does not require balancing.[154] The ALJ continued, "[plaintiff] can occasionally stoop, kneel, crouch, crawl and climb ramps and stairs but never ladders, ropes or scaffolds. [Plaintiff] must avoid all exposure to work at unprotected heights and around moving machinery. [Plaintiff] is limited to unskilled, simple, repetitive and routine tasks."[155] The ALJ explained the two-step process she applied to determine the intensity, persistence, and limiting effect of plaintiff's symptoms: while plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms (step one), plaintiff's statements concerning the intensity, persistence and limiting effects of these symptoms were not credible to the extent they were inconsistent with the residual functional capacity assessment conducted by the State agency medical consultant (step two).[156] Regarding the second step, the ALJ explained that since statements in the record about the intensity, persistence, or functionally limiting effects of pain or other symptoms were not substantiated by objective medical evidence, she had to make a finding on the credibility of the statements based on a consideration of the entire record.[157] The ALJ said that she considered plaintiff's "medical record which does not reflect the type of medical treatment one would expect for a totally disabled individual or for one with symptoms as alleged by [plaintiff]."[158] She reviewed the numerous diagnostic tests that plaintiff underwent, which resulted in minimal clinical findings

---

[153] R. at 39-44.
[154] R. at 39.
[155] *Id.*
[156] R. at 40.
[157] *Id.*
[158] *Id.*

that required little or no follow-up treatment.[159] She considered the ongoing attempts by his primary care physician, Dr. Peplos, as well as specialists to address his persistent nausea and dizziness (including his gastrointestinal symptoms).[160] She also reviewed the consultations and treatment for plaintiff's anxiety and depression.[161] Next, the ALJ evaluated the opinion evidence provided by Dr. Peplos, his physician, and Dr. Ward, who provided psychiatric treatment, which she ultimately afforded "minimal weight."[162] The ALJ found Dr. Peplos' opinion to be conclusory because it only stated that *plaintiff* "stated he could not do work-related activities because of nausea and the need to lie down all of the time" and did not identify any specific work-place abilities or limitations or otherwise include any comments of her own.[163] Of additional concern, the ALJ referred to the possibility of doctor's bias only in an effort to assist his or her patient and the increased likelihood of this possibility in situations where there is little if any diagnostic data to support the patient's alleged symptoms.[164] With regard to Dr. Ward, the ALJ found the "checklist" section of the Mental Impairment Questionnaire, which suggested disability, to be inconsistent with the narrative section, in which Dr. Ward "minimize[d] the nature, severity, and extent of [plaintiff's] condition." [165] The ALJ quoted portions of the narrative section of the Mental Impairment Questionnaire: "[plaintiff] should be more functional...; no physical illness identified even with extensive testing."[166] The ALJ noted that despite the best efforts of several treating sources, the plaintiff's "symptoms persist even though there is no objective or clinical

---

[159] R. at 41.
[160] R. at 41-42.
[161] R. at 42.
[162] R. at 42-43.
[163] R. at 42.
[164] *Id.*
[165] R. at 43.
[166] *Id.*

basis to support his claims."[167] She stated that "although he alleges near constant nausea and gastrointestinal distress,"...she "find[s] it telling that the claimant's treating sources fail to directly address [the fact that he has no documented weight loss]."[168] She concluded that because plaintiff's "treatment records fail to support" the opinions of Dr. Peplos and Dr. Ward and their conclusory limitations, she gave them "minimal weight."[169] Because of the limitations in the treating source opinions, the ALJ instead gave "great weight" to the State agency consultant's opinion, which consisted of a Physical RFC Assessment that allowed for the full range of medium work subject to certain limitations based on plaintiff's symptoms and medical condition.[170] However, the ALJ considered plaintiff's diagnosed anxiety and depression and their effect on his concentration when she imposed an additional restriction to the RFC which would limit plaintiff "to the performance of unskilled, simple, repetitive and routine tasks."[171] The ALJ added that she did not find plaintiff's "testimony regarding the severity or frequency of his symptoms to be fully credible or supportive of any greater limitations" than those already in the RFC.[172]

At step four, the ALJ found that he was thus unable to perform his past relevant work as a brick layer, which was characterized as heavy, skilled work.[173] At step five, based on the VE's testimony and the Medical-Vocational Rules, the ALJ found that there are jobs that exist in significant numbers in the national economy that plaintiff, given his RFC, can perform.[174]

## STANDARD OF REVIEW

---

[167] *Id.*
[168] *Id.*
[169] *Id.*
[170] R. at 43-44.
[171] R. at 44.
[172] *Id.*
[173] *Id.*
[174] R. at 45.

The Court performs a *de novo* review of the ALJ's conclusions of law, but the ALJ's factual determinations are entitled to deference.[175] The Court examines the entire record but does not reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ.[176] The Court will uphold the ALJ's decision "if it is supported by substantial evidence and is free from legal error."[177] Substantial evidence is evidence "'a reasonable mind might accept as adequate to support a conclusion.'"[178] Where reasonable minds differ over conflicting evidence, the Commissioner is responsible for determining whether a plaintiff is disabled.[179] However, the Commissioner's decision is not entitled to unlimited judicial deference.[180] An ALJ "must minimally articulate his reasons for crediting or discrediting evidence of disability."[181] The Court conducts a "'critical review of the evidence'" and will not uphold the ALJ's decision when "it lacks evidentiary support or an adequate discussion of the issues."[182] The ALJ, in his or her decision in a social security disability benefits case, is not required to mention every piece of evidence but must provide an accurate and logical bridge between the evidence and the conclusion that the claimant is not disabled, so that a reviewing court may assess the validity of the agency's ultimate findings and afford the claimant meaningful judicial review.[183] If the Commissioner's decision lacks adequate discussion of the issues, it will be remanded.[184]

---

[175] *Prochaska v. Barnhart*, 454 F.3d 731, 734 (7th Cir. 2006).
[176] *See Powers v. Apfel*, 207 F.3d 431, 434-35 (7th Cir. 2000).
[177] *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).
[178] *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)); *Powers*, 207 F.3d at 434.
[179] *Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 2000).
[180] *Clifford*, 227 F.3d at 870.
[181] *Id.*
[182] *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003) (quoting in part *Clifford*, 227 F.3d at 869).
[183] *Steele*, 290 F.3d at 941; *Clifford*, 227 F.3d at 872, 874.
[184] *See Lopez ex rel. Lopez*, 336 F.3d at 539; *Steele*, 290 F.3d at 940.

ANALYSIS

Plaintiff argues that the ALJ's decision should be reversed or remanded because, first, the ALJ improperly concluded that plaintiff did not meet a Listing at step three and, second, the ALJ erred in her RFC determination. With specific regard to the RFC determination, the issue is whether the ALJ provided adequate support for her conclusions regarding the plaintiff's credibility and the weight of the medical opinion evidence. Third, while the plaintiff does not raise this particular issue, the Court finds issue where the Listing determination acknowledges that plaintiff suffers from somatoform disorder, but the RFC determination fails to mention the possibility of this disorder or its symptoms.

## I. The Listing Determination

Plaintiff argues that the ALJ made an improper determination that plaintiff does not meet either Listing for mental illness, section 12.04 for depression and other affective disorders or section 12.07 for somatoform disorder and, further, that the ALJ did not properly review the opinion evidence of plaintiff's psychiatrist, Dr. Ward. The Commissioner argues that since the ALJ reasonably rejected Dr. Ward's opinion evidence, which was the evidence on which a Listing would have been proven, the ALJ made a proper determination that plaintiff did not meet a Listing for a mental disorder.

A claimant is disabled if he or she meets or medically equals the requirements of an impairment described in the Listing of Impairments.[185] To meet the requirements and thus be found disabled, Listings 12.04 (affective disorders) and 12.07 (somatoform disorders) both

---

[185] 20 C.F.R. §§ 404.1525, 416.925, Pt. 404, Subpt. P, App. 1, §§ 12.04, 12.07.

require that the claimant meet both the paragraph A and paragraph B criteria.[186] The criteria in paragraph A medically substantiate the presence of the mental disorder while the criteria in paragraph B describe functional limitations associated with the medically substantiated disorder.[187] The paragraph B criteria include: 1) activities of daily living; 2) social functioning; 3) concentration, persistence or pace; and 4) episodes of decompensation.[188] These functional limitations must be the result of the mental disorder described in the diagnostic description manifested by the medical findings in paragraph A.[189] To satisfy these criteria, a claimant must have either a marked limitation in two of the first three criteria or a marked limitation in one of the first three criteria and three or more episodes of decompensation in one year.[190]

To meet the standard of substantial evidence, an ALJ must provide more than simply her conclusions of the paragraph B criteria. For example, in *Craft v. Astrue*, the Seventh Circuit reversed and remanded where the ALJ failed to follow the "special technique" outlined in the regulations because the ALJ concluded that the plaintiff did not meet the listing "without discussing [the plaintiff's] mental medical history...."[191] The ALJ had recited some of the mental medical history in the RFC analysis, but the court stated that the "RFC analysis is not a substitute" for analyzing a claimant's functional limitations at paragraph B even though some of the evidence may overlap.[192] Citing the regulations, the court stated that "[t]he ALJ must document use of the special technique by incorporating the pertinent findings and conclusions

---

[186] 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 12.04, 12.07.

[187] *Id.*

[188] *Id.*

[189] *Id.*

[190] *Id.*

[191] 539 F.3d 668, 675 (7th Cir. 2008).

[192] *Id.* (citing generally to SSR 96-8p, which provides that the "mental RFC assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraphs B and C of the adult mental disorders listings in 12.00 of the Listing... ").

into the written decision," and that "[t]he decision must elaborate on significant medical history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the mental impairment's severity."[193]

In the case at hand, the ALJ likewise failed to discuss what mental medical history supported her conclusion that plaintiff did not meet the paragraph B criteria. In the Listing analysis, the ALJ states that her conclusion is "amply supported by the claimant's medical records and the State agency medical opinion" as well as "claimant's reports of his activities of daily living and consideration of the claimant's testimony" at the hearing.[194] This explanation is not enough to satisfy the substantial evidence standard because it is so vague that the Court is unable to "assess the validity of the agency's ultimate findings" in order to afford plaintiff "meaningful judicial review."[195] First, even though the ALJ rated the severity of each of the four functional limitations, she did so without discussion of plaintiff's mental medical history.[196] The ALJ has very generally listed the parts of the record that support her conclusion but does not refer to any of the facts to show why, for example, she found plaintiff to have *moderate* difficulties in maintaining concentration, persistence or pace. Later, in the RFC analysis of the ALJ's decision, she summarizes some of plaintiff's testimony and medical history,[197] but as the Seventh Circuit stated, such a recitation cannot be a substitute for an analysis of plaintiff's paragraph B functional limitations "even though some of the evidence considered may overlap."[198]

Second, the ALJ does not explain why she gave weight to the State agency consultant and

---

[193] *Id.* (citing 20 C.F.R. § 404.1520a(e)(4) *as amended*).
[194] R. at 39.
[195] *See Craft* 539 F.3d at 673.
[196] *See* 20 C.F.R. §§ 404.1520a(d)(3), (e)(4), 416.920a(d)(3), (e)(4) *as amended*; *Craft*, 539 F.3d at 675.
[197] *See* R. at 40-44.
[198] *See Craft*, 539 F.3d at 675.

furthermore, why she gave no weight to Dr. Ward's determinations regarding plaintiff's four functional limitations.[199] The ALJ is required to determine which medical opinions, whether treating or non-treating, should receive weight in a social security disability benefits case and must explain the reasons for that finding.[200] The regulations state that "[r]egardless of its source, we will evaluate every medical opinion we receive,"[201] and that "...the [ALJ] must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant...as the [ALJ] must do for any opinions from treating sources...."[202] Dr. Ward was plaintiff's treating psychiatrist, whose examinations, notes, and explanations were relevant to the functional limitations resulting from plaintiff's mental impairments.[203] Likewise relevant, Dr. Ward specifically rated the four functional limitations of paragraph B in her Mental Impairment Questionnaire.[204] Based on Dr. Ward's opinion, plaintiff satisfied the paragraph B criteria because he was found to have *marked* difficulties in two of the three criteria: maintaining social functioning and maintaining concentration, persistence, or pace.[205]

The Commissioner argues that the ALJ reasonably rejected Dr. Ward's opinion evidence later on in the RFC discussion of the decision; however, the Court is unable to assess whether she reasonably rejected Dr. Ward's paragraph B conclusions because she does not mention Dr. Ward's opinion in the Listing analysis portion of the decision.[206] Further, that ALJ did not

---

[199] *See* R. at 152.
[200] 20 C.F.R. §§ 404.1527(d), (f), 416.927(d), (f); *Craft* 539 F.3d at 676.
[201] 20 C.F.R. §§ 404.1527(d), 416.927(d).
[202] 20 C.F.R. §§ 404.1527(f)(ii), 416.927(f)(ii).
[203] *See* 20 C.F.R. §§ 404.1527(d)(1)-(6), 416.927(d)(1)-(6) (listing the factors to be considered in how much weight to give to a medical opinion).
[204] R. at 152.
[205] *Id.*; *see* 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 12.04, 12.07.
[206] *See* R. at 38-39.

outright reject the entire opinion; rather, she afforded it "minimal weight,"[207] so it is likewise unclear whether the ALJ actually intended to reject that specific portion of Dr. Ward's opinion. The ALJ needs to explain in her Listing analysis what weight (if any) she gave Dr. Ward's conclusions regarding plaintiff's functional limitations.[208]

With regard to the State agency medical opinion that the ALJ referred to, this evidence is a *physical* RFC assessment and as such, does not lend anything to the determination of functional limitations of plaintiff's *mental* impairments, the only impairments at issue for plaintiff at step three. The State agency consultant's RFC assessment is a checklist of plaintiff's physical limitations and contains no explanations for the answers given.[209] It is difficult to see what support exists in an RFC assessment that gives only conclusory answers regarding physical impairments, especially where the paragraph B limitations "must be the result of the mental disorder[s]," in this case, depression and somatoform disorder.[210] Even if it were clearer to the Court why the ALJ gave weight to the State agency consultant, the ALJ did not state the reasons for her findings as the regulations require.[211] Therefore, despite having stated her sub-conclusions for each of the four functional limitations, the ALJ failed to minimally articulate the evidence that supported her conclusion that plaintiff does not meet a mental impairment in the Listing.

## II. The RFC Determination

There are four principal arguments with respect to the RFC determination: (1) that the

---

[207] *See* R. at 43.
[208] *See* 20 C.F.R. §§ 404.1527(d), (f), 416.927(d), (f); *see also Craft* 539 F.3d at 676.
[209] R. at 531-38, 552-54.
[210] *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 12.04, 12.07.
[211] *See* 20 C.F.R. §§ 404.1527(f)(ii), 416.927(f)(ii).

ALJ erred when making a credibility determination regarding plaintiff's testimony and, in connection with that, when evaluating plaintiff's subjective symptoms; (2) that the ALJ erred when either weighing or failing to weigh the medical opinion evidence of three treating sources as well as one nonexamining source, the State agency consultant; (3) that the ALJ erred when she "succumbed to the temptation to play doctor;" and (4) that the ALJ erred when she failed to consider a portion of the VE's testimony.

## A. Credibility Determination and Plaintiff's Subjective Symptoms

Although plaintiff does not explicitly contest the validity of the ALJ's determination that plaintiff is less than credible, the Court finds issue with the lack of explanation surrounding the credibility determination and believes it should be addressed. When the ALJ finds the existence of a medically determinable physical or mental impairment that could reasonably be expected to produce the symptoms alleged, the ALJ will then evaluate the intensity, persistence, and functionally limiting effects of the symptoms to assess claimant's RFC.[212] This requires the ALJ to make a finding on the credibility of the claimant's statements regarding the symptoms and its functional effects.[213] The ALJ's credibility determinations are entitled special deference.[214] It is thus generally understood that a reviewing court does not reconsider credibility determinations made by the ALJ so long as the ALJ identifies some support in the record.[215] Accordingly, the courts have overturned the ALJ's credibility determinations only if they are "patently wrong."[216]

---

[212] 20 C.F.R. §§ 404.1529(b)-(d), 416.929(b)-(d); *see also* SSR 96-7p.

[213] SSR 96-7p.

[214] *Sims v. Barnhart*, 442 F.3d 536, 538 (7th Cir. 2006) (stating that "[c]redibility determinations can rarely be disturbed by a reviewing court, lacking as it does the opportunity to observe the claimant testifying."); *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000).

[215] *Anderson v. Sullivan*, 925 F.2d 220, 222 (7th Cir. 1991).

[216] *Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008).

The ALJ, however, is still required to "build an accurate and logical bridge between the evidence and the result"[217] and must give specific enough reasoning to enable the claimant and a reviewing body to understand the reasoning.[218]

The regulations state that the ALJ should look to a number of factors to determine credibility, such as the objective medical evidence, the claimant's daily activities, the duration, frequency and intensity of allegations of pain, aggravating factors, types of treatment received and medication taken, and functional limitations.[219] The regulations specify that a claimant's statements will not be rejected solely because they are not substantiated by objective medical evidence.[220] The Seventh Circuit likewise has emphasized that "[t]he absence of an objective medical basis which supports the degree of severity of subjective complaints alleged is just one factor to be considered in evaluating the credibility of the testimony and complaints."[221]

With regard to the ALJ's duty to provide substantial evidence, in *Villano v. Astrue* the Seventh Circuit found an ALJ's decision insufficient because he "should have at least explained whether and why he found that testimony credible or not credible."[222] Even though the ALJ "briefly described [the plaintiff's] testimony about her daily activities, he did not, for example, explain whether [the plaintiff's] daily activities were consistent or inconsistent with the pain and limitations she claimed," as required under Social Security Ruling 96-7p.[223] Similarly, the Seventh Circuit again remanded a case where the ALJ failed to articulate anything more than

---

[217] *Shramek*, 226 F.3d at 811.
[218] *Craft*, 539 F.3d at 678; *see* SSR 96-7p (stating that an ALJ must "consider the entire case record and give specific reasons for the weight given to the individual's statements.").
[219] 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); *see also* SSR 96-7p; *Prochaska*, 454 F.3d at 738.
[220] 20 C.F.R. §§ 404.1529(c)(2), 416.929(c)(2); *see also* SSR 96-7p.
[221] *Scheck v. Barnhart*, 357 F.3d 697, 703 (7th Cir. 2004).
[222] 556 F.3d 558, 563 (7th Cir. 2009) (emphasis added).
[223] *Id.* at 562.

"meaningless boilerplate" when he stated, "…claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible."[224] The court further criticized the decision for its inadequate explanation because the ALJ's "statement that [the plaintiff's] testimony is 'not *entirely* credible' yields no clue to what weight the trier of fact gave the testimony."[225]

In the case at hand, the Court does not have a basis to decide whether the credibility determinations are "patently wrong"[226] because the ALJ has not articulated why she finds plaintiff's statements to be not credible. The ALJ recounts portions of plaintiff's testimony, which include his daily activities, the intensity of his nausea, and how he attempts to treat his condition,[227] all of which are relevant to a credibility determination.[228] In the next paragraph, the ALJ states her conclusion, that "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the [RFC] assessment."[229] She continues her RFC determination section and summarizes the history of plaintiff's medical treatment and diagnostic testing,[230] which, as objective medical evidence, is also a relevant factor for a credibility determination.[231] However, as in *Villano v. Astrue*, discussed above, the ALJ merely describes plaintiff's testimony and objective medical

---

[224] *Parker v. Astrue*, 597 F.3d 920, 921-22 (7th Cir. March 12, 2010).

[225] *Id.* at 922. (emphasis in original).

[226] *See Craft*, 539 F.3d at 678.

[227] R. at 40-41. It may be worthwhile to note that the ALJ misstates some of plaintiff's testimony: While the ALJ states that plaintiff "takes daily walks around the block for about an hour and a half and drives out into the country every day," R. at 40, plaintiff testified that he takes walks of about one to one and a half *miles* (without specifying how often) and that he drives "probably every day...out in the country by my house, take a ride around the block...." R. at 20. Also, the ALJ states that plaintiff testified that he had been suffering from anxiety and depression before his onset date, R. at 40, but plaintiff stated he started to experience anxiety and depression *at* the onset date. R. at 14.

[228] *See* 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); *see also* SSR 96-7p.

[229] R. at 40.

[230] R. at 41-42.

[231] *See* 20 C.F.R. §§ 404.1529(c)(2), 416.929(c)(2); *see also* SSR 96-7p.

evidence without explaining why she found his complaints not credible.[232] The only time that the ALJ may have referred to support in the record for her finding is when she stated that she "find[s] it telling" that despite plaintiff's alleged nausea, his treating sources failed to address his lack of weight loss.[233] However, as discussed below, without a medical opinion on the issue, the ALJ may not properly draw the inference that since plaintiff has not lost weight, it is less likely that his nausea is as severe as he claims. But regardless of its propriety, the ALJ made this statement in the section of her decision that assesses the weight of the treating physicians' opinions,[234] so it may not even be support for the credibility determination. For these reasons, the statement regarding plaintiff's lack of weight loss is insufficient to create an accurate and logical bridge between the evidence and the ALJ's credibility determination.

Secondly, the ALJ states her conclusion that "the claimant's statements...are not credible..." and qualifies it with the phrase, "...to the extent they are inconsistent with the [RFC] assessment," but she does not state when and why they are inconsistent.[235] The ALJ is presumably referring to the Physical RFC Assessment completed by the State agency consultant, the only RFC assessment in the record, which consists mainly of checkmarks and lacks explanatory comments.[236] For these reasons, it is unclear which of plaintiff's statements were disregarded by the ALJ as being inconsistent with the RFC assessment. As in *Parker v. Astrue*, discussed above, the "boilerplate" conclusion and its qualifying phrase "yield no clue to what weight the [ALJ]

---

[232] *See* 556 F.3d at 562.
[233] *See* R. at 43.
[234] *See id.*
[235] R. at 40.
[236] *See* R. at 531-38.

gave the testimony" because the ALJ does not explain to what extent the testimony is inconsistent with the RFC assessment.[237]

After discounting plaintiff's credibility, the ALJ mentions plaintiff's testimony once more when she re-states her conclusion: "I do not find the claimant's testimony regarding the severity or frequency of his symptoms to be fully credible or supportive of any greater limitations or restrictions than those I have included in the RFC set forth in this decision."[238] Once again, mirroring *Parker*, the ALJ "yields no clue to what weight" she gave the testimony because she stated that plaintiff was "not *fully* credible,"[239] without explaining what weight, if any, she gave to any of plaintiff's statements regarding his symptoms. Moreover, in this statement, the ALJ makes a secondary conclusion as an alternative to her credibility determination; however, this secondary conclusion – that plaintiff's complaints, if credible, would not further restrict his ability to do work-related activities – also lacks explanation. During plaintiff's hearing, he discussed his nausea and its effect on his daily life.[240] He stated that he experiences extremely severe nausea (a ten on a ten-point scale) at least four days a week.[241] When it is extremely severe, plaintiff explained, "I can't do much of anything. My body gets very weak. It's like my whole body is sick…my legs shake, my arms shake, everything shakes, and I'm just so weak. I cannot, I go lay down."[242] These descriptions of his subjective symptoms are relevant to the inquiry of intensity, persistence, and functional limitations on plaintiff's capacity to do work-related activity, but the ALJ does not consider or mention them in the decision. The only time that the ALJ mentions the

---

[237] *See* 597 F.3d at 922.
[238] R. at 44.
[239] *Id.* (emphasis added).
[240] R. at 9-13, 23-24.
[241] R. at 12.
[242] R. at 13.

complaints of nausea is when she states that she "find[s] it telling" that plaintiff's doctors never addressed the fact that plaintiff had not lost any weight in spite of his nausea. This statement, however, does not explain the impact (or lack of impact) of the nausea and thus does not support the conclusion that plaintiff's testimony is not "supportive of any greater limitation or restriction than those...included in the [RFC]..."[243] (In addition, it appears the ALJ intended this statement as support for the conclusion regarding the weight given to the treating physicians' opinion, not plaintiff's subjective symptoms.)

In considering the intensity, persistence, and functional limitations of the symptoms of plaintiff's medically determinable impairments, the ALJ is required to minimally articulate how she arrived at the credibility determination and/or how she concluded that plaintiff's "testimony regarding the severity or frequency of his symptoms" are not "supportive of any greater limitations or restrictions" on his RFC,[244] but she has not addressed either.

**B. Medical Opinion Evidence**

The Court now addresses whether the ALJ adequately discussed or otherwise provided a reasonable basis for her conclusions regarding the weight given to the medical opinion of treating psychiatrist Dr. Ward, treating psychiatrist Dr. Smedegard, treating physician Dr. Peplos, and finally, the State agency consultant who submitted a Physical RFC Assessment.

**1. Did the ALJ fail to provide substantial evidence or otherwise fail to provide a reasonable basis for her rejection of Dr. Ward's medical opinion evidence?**

Plaintiff does not expressly argue that the ALJ failed to meet the substantial evidence standard when she rejected Dr. Ward's opinion evidence, but he does argue that the ALJ

---

[243] *See* R. at 44.
[244] *See id.*

misinterpreted and erroneously rejected Dr. Ward's opinion evidence based on a lack of understanding of the nature of somatoform disorder. The Commissioner argues that the ALJ reasonably rejected Dr. Ward's opinion because it expressed uncertainty as to whether plaintiff suffered from somatoform disorder.

The ALJ is required to determine which treating and examining doctors' opinions should receive weight in a social security disability benefits case and must explain the reasons for that finding.[245] Generally, the opinion of a treating physician who is familiar with the claimant's impairments, treatments, and responses should be given greater weight than a non-treating physician.[246] More specifically, the "treating physician's rule" directs the ALJ to give controlling weight to the medical opinion of a claimant's treating physician if it is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence.[247]

However, an ALJ may discount a treating physician's medical opinion if she "minimally articulate[s] the reasons for crediting or rejecting the evidence of disability…"[248] The ALJ should look at factors such as how many times the physician saw the patient, whether the physician is a specialist on the medical issues relevant to the plaintiff, how good of an explanation the physician provided, and how consistent the opinion is with the records as a whole.[249] The ALJ may discount a treating physician's medical opinion if the opinion is inconsistent with the opinion of a consulting physician or when the treating physician's opinion is internally inconsistent, so

---

[245] *See* 20 C.F.R. §§ 404.1527(d), (f), 416.927(d), (f); *Craft* 539 F.3d at 676.
[246] 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); *Clifford*, 227 F.3d at 870.
[247] 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); *Bauer v. Astrue*, 532 F.3d 606, 608. (7th Cir. 2008)
[248] *Clifford*, 227 F.3d at 871.
[249] 20 C.F.R. §§ 404.1527(d)(1)-(6), 416.927(d)(1)-(6).

long as she minimally articulates her reasons for crediting or rejecting the evidence of disability.[250] For example, an ALJ found a treating physician's report to be internally inconsistent where the physician stated that the plaintiff was unable to perform repetitive work due to her hand osteoarthritis and paresthesisas and later stated that the hand osteoarthritis was "mild" and that her paresthesisas did not warrant an EMG test.[251] The Seventh Circuit found that the ALJ did not adequately articulate his reasoning because "the ALJ did not explain *why* these statements were necessarily inconsistent…"[252]

In the present case, the ALJ explains that even though Dr. Ward is plaintiff's treating psychiatrist, her opinion is not entitled to controlling weight because it is not supported by clinical and laboratory diagnostics.[253] The ALJ instead discounts the opinion evidence, affording it only "minimal weight," because she finds it internally inconsistent.[254] She specifically identifies the inconsistencies and, in line with *Clifford v. Apfel*, discussed above, she minimally articulates why the opinion is internally inconsistent. She points to three answers given by Dr. Ward in the narrative portion of the Mental Impairment Questionnaire that, together, the ALJ finds inconsistent with the rest of her answers: 1) that plaintiff likely perceives his depression and anxiety as a serious illness, 2) that plaintiff "should be more functional," and 3) that "no physical illness [has been] identified even with extensive testing."[255] The ALJ explains that these statements are inconsistent because they "minimize nature, severity, and extent" of plaintiff's

---

[250] 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); *Clifford*, 227 F.3d at 871.
[251] *Clifford*, 227 F.3d at 871.
[252] *Id.* (emphasis added).
[253] R. at 43.
[254] *Id.*
[255] R. at 153.

condition.[256] However, even though the ALJ articulates her reasons for affording only minimal weight, the bridge she has built between the evidence and the conclusion is not a "logical and accurate" one because her reasoning is based on an unreasonable interpretation of the evidence.[257] As plaintiff argues, Dr. Ward's answers on the narrative portion are ultimately consistent with the rest of her answers and with the symptoms of somatoform disorder.

Relevant here is a Seventh Circuit case where the court found reversible error where the ALJ's disability determination was based on the ALJ's failure "to take seriously the possibility that the [pain's] origin was psychological rather than physical."[258] The court pointed to the ALJ's remarks emphasizing the lack of objective evidence to support the plaintiff's extreme accounts of pain and limitation as a demonstration of the ALJ's misunderstanding of somatization.[259] The court held that it could not uphold a decision that "exhibits deep logical flaws."[260] In another case, the Seventh Circuit could not uphold the ALJ's determination that a treating physician's opinion was internally inconsistent because, in addition to an inadequate explanation as to why it was internally inconsistent, the court pointed out that the ALJ failed to consider an alternative, logical possibility that would reconcile the two seemingly inconsistent statements in the physician's opinion.[261]

Similar to *Clifford*, discussed above, it appears that the ALJ in this case did not consider

---

[256] R. at 43.

[257] *See* R. at 153.

[258] *Carradine v. Barnhart*, 360 F.3d 751, 755 (7th Cir. 2004); *see also Bauer*, 532 F.3d at 608 (noting that "[m]any of the reasons offered by the [ALJ] for discounting the evidence of [the treating physicians] suggest a lack of acquaintance with bipolar disorder.").

[259] *Carradine*, 360 F.3d at 754-55*;see also Johnson v. Barnhart*, 449 F.3d 804, 806 (7th Cir. 2006) (recognizing that "pain can be severe to the point of being disabling even though it has no diagnosable cause and thus is entirely in the patient's mind").

[260] *Carradine*, 360 F.3d at 756.

[261] *Clifford*, 227 F.3d at 871.

the alternative, logical possibility that Dr. Ward's narrative answers were actually consistent with her checkbox answers that indicate that plaintiff's physical suffering has a psychological source.[262] First, when Dr. Ward stated that there was no "physical illness identified even with extensive testing," this statement was consistent, not inconsistent, with the rest of her answers that all suggested that the source of plaintiff's illness is psychological and *not physical*.[263] Next, when Dr. Ward stated that plaintiff "should be more functional," this bare statement simply does not provide enough information to conclude that Dr. Ward was being inconsistent. Finally, when Dr. Ward states that it is "likely his anxiety and depression is being 'perceived' by patient as serious illness,"[264] again, there is nothing to suggest inconsistency with Dr. Ward's prior answers that plaintiff's symptoms and complaints are "somatic."[265] Dr. Ward never explicitly diagnosed plaintiff with somatoform disorder, and her questionnaire reflects that she was unable to make a conclusive diagnosis. This is distinguishable from a medical opinion that is inconsistent and thus unreliable medical evidence.

Next is the related issue of whether the ALJ understands and appreciates the nature of somatoform disorder. The ALJ has not disregarded plaintiff's symptoms entirely on the basis that they have  a psychological origin because she suggests that she would have given greater weight to Dr. Ward's medical opinion if Dr. Ward had expressed greater certainty over the severity of plaintiff's condition and had not minimized the severity with her "internal inconsistencies."[266]

---

[262] *See id.*

[263] *See* R. at 148-52 (Dr. Ward repeatedly refers to "somatic complaints and symptoms," and she marks the checkbox for "unrealistic interpretation of physical signs or sensations associated with the preoccupation or belief that one has a serious disease or injury.").

[264] R. at 153.

[265] R. at 148-152.

[266] R at 43.

However, despite being distinguishable from *Carradine v. Barnhart*, the ALJ, in a similar manner, does not appreciate that the source may be a psychological impairment because she fails to mention even the possibility of somatoform disorder in her RFC determination. Furthermore, in her analysis of Dr. Ward's opinion evidence, the ALJ states, "I find it telling that the [plaintiff's] treating sources fail to directly address…the marked differences between the claimant's alleged symptoms and the minimal diagnostic findings."[267] However, Dr. Ward, plaintiff's treating psychiatrist, does address this when she repeatedly refers to plaintiff's "somatic complaints" on the Multiaxial Evaluation, in the various checkbox components, and in the narrative components of the Mental Impairment Questionnaire.[268] Plaintiff's other treating psychiatrist, Dr. Smedegard, also addresses this issue when he likewise characterizes plaintiff's symptoms as "somatic" and includes "undifferentiated somatoform disorder" on his Multiaxial Evaluation for plaintiff.[269] This statement by the ALJ suggests that she failed to recognize the possibility that plaintiff's physical symptoms of constant and severe nausea may have a psychological source, and this failure to recognize may have resulted in an unreasonable interpretation of Dr. Ward's statements, constituting "deep logical flaws."[270] Where the ALJ's conclusion cannot be accepted by a reasonable trier of fact, it cannot be upheld and is subject to remand.[271]

**2. Did the ALJ provide substantial evidence with regard to the opinion evidence of Dr.**

---

[267] *Id.*
[268] R. at 148-53.
[269] R. at 567.
[270] *See Carradine*, 360 F.3d at 756.
[271] *See Clifford*, 227 F.3d at 869; *Powers*, 207 F.3d at 434; *see also Pugh v. Bowen*, 870 F.2d 1271, 1274 (7th Cir.1989) (stating that "[t]he ALJ's *reasonable* resolution of conflicts in the evidence is not subject to review, as we do not reweigh the evidence.") (emphasis added).

**Smedegard?**

Plaintiff argues that Dr. Smedegard is a treating psychiatrist whose opinion was consistent with Dr. Ward's opinion and therefore should have been afforded greater weight. The Commissioner did not respond to this argument.

The Seventh Circuit, in *Craft*, found the ALJ's decision inadequate where it was "merely a recitation of information contained in [claimant's] medical records" and did not make a determination of the weight to be given to two physicians' medical opinions.[272] The court further found issue with the fact that the decision did not even mention one other physician's detailed mental assessment at all.[273]

While the ALJ summarized some of Dr. Smedegard's evaluations of plaintiff, the ALJ did not make a determination as to the weight she afforded it or otherwise give an explanation as to why she failed to consider it.[274] Dr. Smedegard examined and treated plaintiff over the course of at least five months[275] and provided an opinion that was consistent with that of Dr. Ward, the only other source of medical evidence regarding plaintiff's mental impairment.[276] Furthermore, his opinion is supported by an explanation of each of his visits with plaintiff.[277] Therefore, the ALJ erred when she failed to fulfill the regulatory requirement to weigh all

---

[272] 539 F.3d at 677 (citing 20 C.F.R. § 404.1545(c)).

[273] *Id.*

[274] *See id.* (reversing where the "ALJ's discussion was merely a recitation of information contained in [the] medical records" and never explained why the medical opinions at issue were disregarded).

[275] R. at 566-570 (The record includes a psychiatric evaluation and progress notes covering four meetings with plaintiff. This is comparable to eight meetings over the course of approximately four months with Dr. Ward, who the ALJ regarded as a treating physician.).

[276] R. at 148-51 (Dr. Smedegard diagnosed plaintiff with the somatoform disorder at Axis I of the DSM-IV Multiaxial Evaluation while Dr. Ward indicated "multiple somatic complaints and symptoms" at Axis III and repeatedly indicated the same in the narrative portions.).

[277] *See* 20 C.F.R. §§ 404.1527(d)(1)-(6), 416.927(d)(1)-(6) (listing the factors to be considered in how much weight to give to a medical opinion).

medical evidence[278] and further when she failed to consider the specific factors that provide guidance on just how much weight to afford the evidence.[279]

### 3. Did the ALJ provide substantial evidence to support the weight she afforded the State agency consultant's RFC Assessment?

Plaintiff argues that the ALJ erred when she afforded "great weight" to the Physical RFC Assessment by the State agency consultant and that is it should instead be entitled little weight. The Commissioner's brief does not respond to this argument.

The ALJ is responsible for reviewing the evidence and making findings of fact and conclusions of law when the opinion is presented by a treating physician as well as a nonexamining source, which includes the opinions of State agency consultants.[280] The ALJ must explain the weight given to the opinions of a State agency consultant in the same way the ALJ must do for a treating physician.[281] Specifically, the regulations state that "because nonexamining sources have no examining or treating relationship with [the claimant], the weight we will give their opinions will depend on the degree to which they provide supporting explanations for their opinions."[282] Furthermore, the ALJ is to "evaluate the degree to which these opinions consider all of the pertinent evidence in [the claimant's] claim, including opinions of treating and other examining sources."[283] The Social Security Rulings point out that the regulations "provide progressively more rigorous tests" for justifying the weight of an opinion as the ties between the

---

[278] *See* 20 C.F.R. §§ 404.1527(d), (f), 416.927(d), (f); *Craft* 539 F.3d at 676.
[279] *See* 20 C.F.R. §§ 404.1527(d)(1)-(6), 416.927(d)(1)-(6).
[280] 20 C.F.R. §§ 404.1527(f), 416.927(f).
[281] 20 C.F.R. §§ 404.1527(f)(2)(iii), 416.927(f)(2)(iii).
[282] 20 C.F.R. §§ 404.1527(d)(3), 416.927(d)(3).
[283] *Id.*

physician and the plaintiff become weaker.[284] "For example, the opinions of physicians who do not have a treatment relationship with the claimant are weighed by stricter standards, based to a greater degree on medical evidence, qualifications, and explanations for the opinions, than are required of treating sources."[285] The Rulings specify that the opinions of a State agency medical and psychological consultant "can be given weight only insofar as they are supported by evidence in the case record."[286]

In the present case, the ALJ explains, "...because of the inherent limitations I have identified in the treating source opinions [referring to those of Dr. Ward and Dr. Peplos], I gave great weight to the opinion provided by the State agency consultant," but the ALJ does not consider the factors mandated by the regulations.[287] Even if the ALJ had attempted to more adequately explain why she gave great weight to the State agent's RFC assessment, the RFC assessment does not provide supporting explanations (even where the form explicitly requests supporting explanation[288]), which are a significant factor especially with regard to weighing a nonexamining source.[289] Rather, the RFC assessment is made up mostly of only checkmarks, conclusory answers that are unhelpful in making a final determination of disability.[290] Therefore, even if the record provided more support for the weight given to the State agent's opinion, the ALJ did not discuss the relevant factors or otherwise create an accurate and logical bridge

---

[284] SSR 96-6p; *see* 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

[285] *Id.*

[286] SSR 96-6p; *see also* 20 C.F.R. §§ 404.1527(f), 416.927(f).

[287] *See* R. at 43.

[288] *See* R at 531-538.

[289] *See* 20 C.F.R. §§ 404.1527(d)(3), 416.927(d)(3); SSR 96-6p.

[290] *See Stormo v. Barnhart*, 377 F.3d 801, 805-06 (8th Cir. 2004); *Grindle v. Sullivan*, 774 F. Supp. 1501, 1504 n. 3 (N.D. Ill. 1991) (reversing where the nonexamining expert did nothing more than check off boxes on the standard residual functional capacity form, "the numbers…were plucked out of thin air rather than being grounded in any record evidence").

between the evidence and the conclusion.

## 4. Did the ALJ provide substantial evidence to support the weight she afforded the medical opinion of Dr. Peplos?

Plaintiff argues that the ALJ erred when she dismissed Dr. Peplos' opinion evidence on the basis that Dr. Peplos did not identify any specific work place abilities or limitations. The Commissioner responds that the ALJ reasonably rejected the opinion on the basis that Dr. Peplos' findings were conclusory. The plaintiff further argues that it was improper of the ALJ to accuse Dr. Peplos of "treating physician's bias" towards plaintiff. The Commissioner responds that it was not improper because the Seventh Circuit has repeatedly recognized the possibility of "treating physician bias." The Seventh Circuit has made it clear that there is no *presumption* of treating physician bias, but the ALJ does have the ability to consider possible bias.[291]

In the present case, the ALJ evaluated the surrounding circumstances and substantiated her reference to possible physician bias by the relevant factor that some of Dr. Peplos' findings were conclusory.[292] She further explains that while it is difficult to confirm treating physician bias, it is more likely to exist "where there is little, if any, diagnostic data supportive of [plaintiff's] alleged symptoms."[293] Since the ALJ was able to reasonably support her suggestion of physician bias, it does not appear that she is impermissibly *presuming* it.

With regard to substantial evidence, as with Dr. Ward's opinion, the ALJ recognized that Dr. Peplos was a treating physician but that since the specific finding regarding plaintiff's nausea was not supported by objective evidence, the opinion was not entitled to controlling weight.[294]

---

[291] *Edwards v. Sullivan*, 985 F.2d 334 (7th Cir. 1993) (citing *Micus v. Bowen*, 979 F.2d 602, 609 (7th Cir. 1992)).
[292] R. at 42.
[293] *Id*.
[294] R. at 42-43.

The part of Dr. Peplos' opinion most relevant to the question of disability is what the ALJ focused on when she determined to afford it only "minimal weight" for being conclusory: in response to a question regarding plaintiff's ability to do work-related activity, Dr. Peplos answered, "[plaintiff] states he cannot do [the listed work-related activities] due to nausea and must lie down all the time."[295] The ALJ explained that this opinion evidence is conclusory because she finds that Dr. Peplos should have "provide[d] her own opinion or otherwise explained how the minimal diagnostic findings would affect [plaintiff's] ability to perform competitive work on a sustained basis," but instead, Dr. Peplos noted only what the claimant stated to her.[296] The ALJ therefore has provided substantial evidence, including reference to the factors mandated in the regulations, such as "supporting explanation," to support her determination to afford minimal weight to Dr. Peplos' opinion evidence.[297]

## C. "Succumbing to the Temptation to Play Doctor"

Plaintiff argues that the ALJ erred when she "played doctor" by depending on her own inference that because plaintiff had not lost any weight, his complaints of nausea were unfounded. The Commissioner concedes that the ALJ did indeed "succumb to the temptation to play doctor" but claims that it is harmless error because the ALJ's ultimate conclusion is supported by substantial evidence.

The ALJ's assessment of the claimant's credibility may determine how much weight is given to each piece of evidence; however, the ALJ may only balance the evidence, not discard it and formulate a new medical opinion.[298] Absent any record support, the ALJ may not substitute

---

[295] *See* R. at 550.
[296] R. at 42.
[297] *See* 20 C.F.R. §§ 404.1527(d), 416.927(d).
[298] *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996).

her judgment of what a condition requires for that of a treating medical professional.[299] If an ALJ makes an independent medical finding rather than relying on findings in the record, she is said to have "succumb[ed] to the temptation to play doctor."[300]

Even though the ALJ's observation that plaintiff had not lost weight may not have had any real impact on her conclusion that he was less than credible or that the physicians' opinions should only be afforded "minimal weight," she nevertheless articulated in her decision her own judgment for a medical effect of nausea. While in isolation, this error may be regarded as harmless, but when it is compounded with the ALJ's failure to adequately articulate her reasons supporting the Listing determination, the credibility determination, and the weight she gave to certain medical evidence, the Court finds that this is reversible error.[301]

## D. The VE's Testimony

Plaintiff argues that the ALJ erred by not considering the VE's response to a hypothetical question in which the individual required unscheduled breaks, was off task, and was absent more than four days a month. The Commissioner responds that since the hypothetical was based on findings in Dr. Ward's opinion evidence, and since the ALJ rejected her opinion, the ALJ is not required to consider that specific testimony of the VE.

The ALJ is only required to "incorporate into his hypotheticals those impairments and limitations that he accepts as credible."[302] The Seventh Circuit has found that because "the ALJ was justified in discounting [the physician's] conclusions and [the plaintiff's] credibility,…she

---

[299] *Clifford*, 227 F.3d at 870.

[300] *Id.*

[301] *See Craft*, 539 F.3d at 675 (noting that the compounded effect of multiple failures to meet the standard of substantial evidence is that none is regarded as "harmless.").

[302] *Simila v. Astrue*, 573 F.3d 503, 521 (7th Cir. 2009) (quoting *Schmidt v. Astrue*, 496 F.3d 833, 846 (7th Cir. 2007)).

was not required to include these limitations in her hypotheticals."[303]

In the case at hand, to the extent that the ALJ properly rejected the opinion expressed by Dr. Ward, the ALJ was entitled to reject the parts of the VE's testimony that were based on Dr. Ward's opinions. However, as discussed above, the Court has found issue with the ALJ's treatment of such medical evidence. Therefore, where the ALJ is unable to justify the "minimal weight" she gave to Dr. Ward's opinion, she is not entitled to reject the VE's answer to the hypothetical.

## III. Inconsistency between the Listing determination and the RFC determination

While plaintiff does not expressly argue this inconsistency, the Court believes it should address the issue that the ALJ's overall decision somewhat contradicts itself. The ALJ adopts the evidence that plaintiff suffers from somatoform disorder when she evaluates whether he meets the Listing for somatoform disorder, but does not even mention evidence of that diagnosis when she determines his RFC.

The Seventh Circuit reversed and remanded a case to the Social Security Administration where the ALJ stated, at the beginning of his discussion, that the plaintiff was suffering from depression and post-traumatic stress disorder as of the date last insured, but later stated that the psychiatric impairments and treatment all surfaced after the last date insured.[304] The Seventh Circuit identified this contradiction and criticized the decision for not even attempting to explain the contradiction.[305] This deficiency, along with the ALJ's "meaningless boilerplate" rejecting the plaintiff's credibility and the failure to consider the plaintiff's complaints rendered the decision

---

[303] *Id.*; *see also Edwards*, 985 F.2d at 338-39 (finding that since the ALJ properly rejected the medical opinion on which the vocational report largely relied, the ALJ was also entitled to reject the VE's findings).
[304] *Parker*, 597 F.3d at 924-25.
[305] *Id.*

deficient beyond harmless error.[306]

Similarly, in the present case, the ALJ does not discuss why she finds evidence of plaintiff's affective disorders and somatoform disorders to be medically determinable mental impairments that meet the threshold paragraph A requirement; rather, she accepts them implicitly and jumps straight to the paragraph B criteria.[307] The discussion determining plaintiff's RFC does not acknowledge either somatoform disorder or the concept of a psychological source of a physical impairment.[308] Without attempting to explain the inconsistency, the RFC determination portion instead discusses the lack of objective medical evidence, the lack of treatment plaintiff receives, and the unreliability of the medical opinion evidence. The RFC discussion is limited to consideration of the physical impairments (including gastrointestinal problems) and the diagnoses for anxiety and depression (by Dr. Ward and Dr. Smedegard).[309] Thus, while the ALJ's decision accepts the diagnosis of somatoform disorder (by Dr. Smedegard and arguably, Dr. Ward), it later fails to acknowledge even the possibility of the impact of symptoms of somatoform disorder.

---

[306] *Id.*
[307] *See* R. at 39; 20 C.F.R. Part 404, Sbpt. P, App. 1, §§ 12.04, 12.07.
[308] R. at 40-44.
[309] *Id.*

## CONCLUSION

For the reasons set forth above, this Court grants plaintiff's motion for summary judgment [dkt. 14] and denies the Commissioner's motion for summary judgment [dkt. 16]. This case is remanded to the Social Security Administration for further proceedings consistent with this opinion.


IT IS SO ORDERED.

DATE: <u>December 20, 2010</u>

Susan E. Cox
U.S. Magistrate Judge